Stephen H.M. Bloch (#7813)
Laura E. Peterson (#16135)
Joseph J. Bushyhead (#15046)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
Telephone: (801) 486-3161
Facsimile: (801) 486-4233
steve@suwa.org
laura@suwa.org
joe@suwa.org

Attorneys for Plaintiffs
Southern Utah Wilderness Alliance and
The Wilderness Society

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE and THE WILDERNESS SOCIETY,<br><br>     Plaintiffs,<br><br>v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, UNITED STATES FISH & WILDLIFE SERVICE and UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>     Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br><br>Case No. 2:21-cv-00091-DAK<br><br>Honorable Dale A. Kimball |

## INTRODUCTION

1.     The San Rafael Desert Travel Management Area ("TMA") encompasses roughly

377,609 acres of lands managed by the Bureau of Land Management ("BLM") in southeastern

Utah. This sublime area of Utah's backcountry features stunning redrock canyons, important

cultural sites and an outstanding diversity of native species. It includes the newly-designated

Labyrinth Canyon Wilderness as well as significant wilderness-quality lands.



*The San Rafael Desert Travel Management Area in fall © Ray Bloxham*

2.      Even in the heart of these remote wild lands, off-highway vehicles ("OHVs")

have pushed further and further into the backcountry on unauthorized and undesignated trails.

OHVs have a disproportionately large impact on public land resources and other recreationists.

OHVs can cause stream erosion and water pollution, dust and soil erosion, harassment of

wildlife, destruction of habitat, damage to cultural sites and increased conflicts between user

groups.

3.      This lawsuit challenges BLM's approval of the San Rafael Desert Travel Management Plan ("TMP") which blankets this remote and spectacular area with motorized vehicle routes and will degrade and permanently damage these wild lands. The TMP determines where OHVs are allowed to travel on dirt roads and trails within the San Rafael Desert.

4.      On August 21, 2020, BLM released a Final Environmental Assessment ("EA"), Finding of No Significant Impact ("FONSI") and Decision Record ("DR") adopting the San Rafael Desert TMP.[1] BLM's plan "emphasizes maximum mileage available for OHV recreation," more than doubles the miles of routes designated as open to OHVs in the planning area—from 308 miles to 766.8 miles—and opens routes to motorized vehicles that are reclaiming, reclaimed or non-existent on the ground. BLM's adoption of the TMP will have significant impacts on the natural and cultural resources within the San Rafael Desert, including impacts to soil, air quality, cultural resources, wildlife habitat and threatened and endangered species.

5.      Prior to approving the San Rafael Desert TMP, BLM failed to adequately consider and minimize the plan's environmental impacts. In particular, BLM failed to locate OHV trails to minimize damage to natural and cultural resources in violation of the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701, and its implementing

---

[1] *See* Bureau of Land Mgmt., *San Rafael Desert Travel Management Plan Finding of No Significant Impact*, DOI-BLM-UT-G020-2018-0004-EA (Aug. 2020); Bureau of Land Mgmt., *San Rafael Desert Travel Management Plan Decision Record*, DOI-BLM-UT-G020-2018-0004-EA (Aug. 2020); Bureau of Land Mgmt., *San Rafael Desert Travel Plan Environmental Assessment*, DOI-BLM-UT-G020-2018-0004-EA (Aug. 2020). These documents are available online at BLM's website: https://eplanning.blm.gov/eplanning-ui/project/93510/570.

regulations, 43 C.F.R. § 8342.1. BLM also failed to fully analyze and disclose the impact of OHVs on public land resources in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, and its implementing regulations. And the U.S. Fish and Wildlife Service ("Service") violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, when it failed to properly account for the impacts to threatened and endangered species within the San Rafael Desert TMA.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief); and the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701-706.

7.     Venue is proper in the United States District Court for the District of Utah, Central Division, pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff Southern Utah Wilderness Alliance resides in this judicial district.

8.     On August 21, 2020, BLM released the DR and FONSI for the San Rafael Desert Travel Management Plan. This constituted final agency action.

## PARTIES

9.     Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("the Alliance") is a nonprofit environmental membership organization dedicated to the preservation of outstanding wilderness found throughout Utah, including the federal public land encompassing the San Rafael Desert, and the management of wilderness-quality lands in their natural state for the benefit of all Americans. The Alliance is headquartered in Utah, and has members in all fifty states and several foreign countries. The Alliance's members use and enjoy public lands in the

San Rafael Desert area for a variety of purposes including scientific study, recreation and aesthetic appreciation. The Alliance promotes local and national recognition of the region's unique character through research and public education, and supports administrative and legislative initiatives to permanently protect Utah's wild places. The Alliance brings this action on its own behalf and on behalf of its members.

10. Plaintiff THE WILDERNESS SOCIETY ("TWS") is a national non-profit organization working to unite people to protect America's wild places. Founded in 1935 and with more than one million members and supporters, TWS has led the effort to permanently protect 111 million acres of wilderness and to ensure sound management of our shared national lands through public education, scientific analysis and advocacy. TWS sees a future where people and wild nature flourish together, meeting the challenges of a rapidly changing planet. TWS views protecting wilderness-quality and other sensitive Utah BLM-managed lands as vital to achieving its mission and vision. TWS has worked for decades to protect BLM wilderness-quality and other sensitive lands in Utah including the BLM-managed lands in the Price field office and the San Rafael Desert area in particular.

11. The Alliance and TWS (collectively, "SUWA") and their members' interests have been directly affected and irreparably harmed, and continue to be affected and harmed, by BLM's FONSI and DR approving the San Rafael Desert TMP in violation of FLPMA, NEPA, and the APA, as well as by the FWS's Biological Opinion issued in violation of the ESA. SUWA and its members have an interest in the biological, wildlife, recreational, scenic and other natural and cultural resources managed by BLM in Utah's San Rafael Desert, and an interest in BLM's compliance with federal environmental and land management laws.

SUWA's members frequently visit the San Rafael Desert TMA to enjoy recreation, sightseeing, birdwatching, photography and other activities.

12.     Mr. Ray Bloxham, an employee and member of the Alliance, and a member of TWS, has traveled extensively throughout the San Rafael Desert TMA over the last twenty years, including most recently in October 2020. Mr. Bloxham has plans to return to this area again in February 2021 and intends to continue to visit the area for years to come; it is one of his favorite places to visit in Utah. Mr. Bloxham enjoys the incredible scenic views, the area's remote and largely untrammeled nature as well as the native and endemic vegetation and fauna, abundant wildlife and cultural resources. He has hiked, boated, explored and camped throughout the San Rafael Desert.

13.     As a consequence of BLM's failure to comply with FLPMA and NEPA, the agency has failed to minimize the damage from OHVs to natural and cultural resources, failed to minimize user conflicts, failed to fully analyze the environmental impacts of its decision and failed to fully account for potential impacts to threatened and endangered plant and bird species. BLM's decision to authorize motorized vehicles to drive on newly-designated routes—including those routes that are reclaiming, reclaimed or do not exist on the ground—will significantly damage the San Rafael Desert's remote and scenic nature. The agency's decision will diminish SUWA's members' interests in hiking, photographing, visiting, wildlife viewing and camping in this area. SUWA's members also have a substantial interest in seeing that BLM complies with its obligations under federal laws including FLPMA and NEPA and their implementing regulations. The relief sought herein will redress these harms.

14.     As a consequence of the Service's failure to comply with the ESA, the agency has
failed to fully account for impacts to threatened and endangered plant and bird species. The
decision to authorize motorized vehicles on newly-designated routes will introduce new
surface disturbance, damage plant and animal habitat and disturb plants and wildlife in the San
Rafael Desert. The Service's failure to comply with the ESA will diminish SUWA's members'
interests in hiking, exploring, wildflower and wildlife viewing, and photography in the San
Rafael Desert. SUWA's members also have a substantial interest in seeing that the Service
complies with its obligations under the ESA and its implementing regulations. The relief
sought herein will redress these harms.

15.     Defendant BUREAU OF LAND MANAGEMENT is the agency within the
United States Department of the Interior that is responsible for the management of
approximately twenty-three million acres of federal public land in Utah, including the public
lands in the San Rafael Desert at issue in this litigation. BLM is directly responsible for
carrying out the Department of the Interior's obligations under statutes and regulations
governing land use management and for complying with FLPMA, which requires BLM to
minimize the damage from OHVs and to manage public land resources for both present and
future generations, and NEPA, which requires the agency to carefully consider the
environmental impacts of its actions.

16.     Defendant U.S. FISH & WILDLIFE SERVICE is the federal agency within the
United States Department of the Interior that is responsible for conserving, protecting and
enhancing fish, wildlife and plants and their habitats. The agency's primary responsibility is

conserving and managing threatened and endangered species for the American public through implementing the ESA.

17.     Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United States for a variety of competing resources, including the protection of the natural and human environment.

## LEGAL FRAMEWORK

A. **Administrative Procedure Act**

18.     Judicial review of agency actions under FLPMA, NEPA and certain claims under the ESA[2] is governed by the Administrative Procedure Act, which provides judicial review for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. Review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

19.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). Agency actions may also be set aside where the action is "without observance of procedure required by law." 40 C.F.R. § 706(2)(D).

---

[2] The ESA provides two mechanisms for judicial review. *Bennett v. Spear*, 520 U.S. 154, 173-76 (1997). The public can challenge substantive violations of the ESA, such as illegally taking a protected species, under the Act's citizen suit provisions. 16 U.S.C. § 1540(g)(1). The public can also challenge the Service's administration of the Act. *Bennett*, 520 U.S. at 173-74.  These "maladministration" claims are reviewable pursuant to the APA. *Id.* Challenging the adequacy of the Service's biological opinion is a "maladministration" claim reviewable under to the APA. *Id.* at 173-76.

**B.  Federal Land Policy and Management Act**

20.     Under FLPMA, BLM must manage public lands for multiple uses in a manner that "will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values . . . ." 43 U.S.C. § 1701(a)(7), (8). OHV[3] use and recreation are included amongst those multiple uses.

21.     In the early 1970s, as OHV recreation became more prevalent and the resulting environmental damage from that use more apparent, President Nixon signed Executive Order 11,644, 37 Fed. Reg. 2877 (Feb. 9, 1972), directing BLM and other agencies to develop and issue regulations limiting the destructive impacts from OHV use. That Executive Order, amended and expanded by President Carter in 1977 through Executive Order 11,989, 42 Fed. Reg. 26959 (May 25, 1977), is implemented through regulations codified at 43 C.F.R. Part 8340. The regulation requires BLM to comply with the following criteria:

> (a)     Areas and trails shall be located to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands, and to prevent impairment of wilderness suitability.
>
> (b)     Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats. Special attention will be given to protect endangered or threatened species and their habitats.
>
> (c)     Areas and trails shall be located to minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands, and to ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors.

---

[3] OHVs are synonymous with Off-Road Vehicles and are defined as "any motorized vehicle capable of, or designed for travel on or immediately over land, water, or other natural terrain." 43 C.F.R. § 8340.0-5(a).

> (d)     Areas and trails shall not be located in officially designated wilderness areas or primitive areas. Areas and trails shall be located in natural areas only if the authorized officer determines that off-road vehicle use in such locations will not adversely affect their natural, esthetic, scenic, or other values for which such areas are established.

## C. National Environmental Policy Act

22.     Congress enacted NEPA "to promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[4] NEPA has two primary objectives: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision-making. *Id.* § 1500.1(c).

23.     NEPA achieves its purpose through action-forcing procedures that require agencies to take a hard look at the environmental consequences of their actions and authorizations.

24.     The Council on Environmental Quality ("CEQ") regulations implementing NEPA require agencies to "integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts." *Id.* § 1501.2.

25.     NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."

---

[4] On September 14, 2020, the Council on Environmental Quality's revised NEPA regulations went into effect. *See generally* 85 Fed. Reg. 43304 (July 16, 2020). The San Rafael Desert Final EA, FONSI and DR were signed on August 21, 2020 and followed the prior regulations.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To that end, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS") must rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

26.     An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

27.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact. *Id.* § 1508.9(a)(1). Such evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id.* § 1508.13.

28.     NEPA requires agencies to take a hard look at the direct, indirect and cumulative impacts of a proposed action to inform its decision about whether the agency must prepare an EIS because a proposed action significantly impacts the environment. *Id.* §§ 1502.16(a)-(b), 1508.7, 1508.8.

29.     Direct impacts are those impacts "caused by the action and [that] occur at the same time and place." *Id.* § 1508.8(a).

30.     Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b).

31.     Cumulative impacts are "the impact[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

**D.  Endangered Species Act**

32.     Congress enacted the ESA to provide a means to conserve endangered species, threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). Section 7(a)(2) prohibits federal agencies from undertaking actions that are "likely to jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of critical habitat. *Id.* § 1536(a)(2).

33.     An action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. An action destroys or adversely modifies critical habitat when it directly or indirectly alters habitat in a way that "appreciably diminishes the value of critical habitat for the conservation of a listed species." *Id.*

34.     To ensure compliance with Section 7(a)(2)'s substantive mandate, the ESA and its implementing regulations require "action agencies" (here, BLM) to consult with the appropriate wildlife service, in this case the Service, before undertaking any action that "may affect" a listed species or its designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.14(a). Consultation is more than just procedural; under Section 7, the Service may impose substantive limitations on an agency's action necessary to protect species and their habitat.

36.     The action agency begins the consultation process by preparing a biological assessment ("BA"). 16 U.S.C. § 1536(a)(2). A BA contains information concerning the threatened and endangered species and critical habitat present in the action area and evaluates the potential effects of the action on those species and habitats. *Id.* § 1536(c)(1); 50 C.F.R. §§ 402.02; 402.12. The BA must utilize the best scientific and commercial data available or which the action agency can obtain during consultation to adequately determine the effects of an action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

36.      If the action agency determines in a BA that its action "may affect" a listed species or critical habitat, the agency and the Service must engage in formal consultation. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

37.     At the conclusion of the formal consultation process, the Service provides the action agency with a biological opinion detailing how the action affects the species or its habitat. 16 U.S.C. § 1536(b)(3)(A). Among other responsibilities, the Service must "[e]valuate the current status and environmental baseline of the listed species or critical habitat" and evaluate the effects of the action—including indirect and cumulative effects as well as effects of "interrelated or independent activities"—on the listed species or critical habitat. 50 C.F.R. § 402.14(g)(2)-(3); *Id.* § 402.02. Based on this evaluation, the Service must then determine whether the action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4). If the Service determines that the action will likely jeopardize listed species or adversely affect critical

habitat, the Service must suggest reasonable and prudent alternatives which it believes would not result in jeopardy or adverse habitat modification. *Id.* § 402.14(g)(5). If there are no reasonable and prudent alternatives that would avoid jeopardy, the action agency cannot proceed with the action until it obtains an exemption under 16 U.S.C. § 1536(h).

38.     Both the Service and the action agency have a continuing duty to reinitiate consultation under § 7 in three circumstances: 1) if the amount or extent of take exceeds that allowed by an Incidental Take Statement, 2) if new information reveals effects of the action that may affect listed species or critical habitat in a way not previously considered, or 3) if a newly-listed species, or newly-designated critical habitat, may be affected by the action. 50 C.F.R. § 402.16(a).

## FACTUAL BACKGROUND

### I.     San Rafael Desert

39.     The San Rafael Desert TMA encompasses roughly 377,600 acres of BLM-managed lands in southeastern Utah and within the agency's Price Field Office. It is located east of the San Rafael Swell and west of the Labyrinth Canyon stretch of the Green River, and includes the newly-designated Labyrinth Canyon Wilderness Area. Home to desert bighorn sheep, pronghorn antelope, BLM "sensitive species" such as the kit fox and the burrowing owl, and a diverse array of bee species, the San Rafael Desert is a remote and sublime landscape. In the spring, the land is carpeted with wildflowers and blooming yucca.

40.     Much of the San Rafael Desert contains stabilized sand dunes and fragile biological soil crusts which are easily harmed (e.g., eroded) or destroyed when disturbed. Biological soil crusts prevent erosion and help provide nitrogen for plant growth.

41.     The San Rafael Desert is a culturally rich area, and includes highly rare Paleoindian and Paleoarchaic sites estimated to be more than 10,000 years old.

42.     The San Rafael Desert also provides habitat for numerous threatened and endangered plant and animal species, including the Mexican spotted owl, Yellow-billed cuckoo, Jones cycladenia, Navajo sedge, Utes Ladies'-tresses, Wright fishhook cactus, San Rafael cactus and Barneby reed-mustard.

**II.     OHV use and Impacts**

43.     OHVs are vehicles equipped for travel off of improved or maintained roads. Such vehicles include motorcycles, all-terrain vehicles, dune buggies and many kinds of four-wheel drive trucks or jeeps. OHV use has exploded in Utah over the past twenty years. In 2020, there were over 180,000 OHVs registered in Utah, a nearly four-fold increase from twenty years ago. As OHV use on federal public lands has proliferated, so have their environmental impacts.

44.     OHV use both on and off designated trails can result in significant impacts, causing damage to soils, vegetation and wildlife, degrading air and water quality, harming cultural resources and causing conflicts with other public land users. OHVs compress and compact desert soils thereby increasing soil erosion and runoff and decreasing the ability to support vegetation. OHV use can trample vegetation and reduce vegetative cover as well as introduce non-native plant species. Further, OHV use can result in habitat fragmentation that changes the distribution of species across a landscape and affect behaviors like breeding and migration. OHV use can also adversely affect riparian areas, water quality and air quality, and can damage or destroy cultural resources.

### III.    Prior BLM Planning Efforts in the San Rafael Desert

45.    Travel management plans determine where motorized vehicles—including

OHVs—are allowed to travel on public lands. Bureau of Land Mgmt., *Manual 1626—Travel*

*and Transportation Management Manual* ch. 4 (2016).

46.    There have been several iterations of travel planning in the San Rafael Desert

leading up to the plan at issue here.

47.    The Price Field Office's 1991 San Rafael Resource Management Plan ("RMP")

established OHV area designations in part of the San Rafael Desert TMA. The RMP

designated approximately 1,031,631 acres of BLM-managed public lands as "limited to

designated roads and trails," designated approximately 82,627 acres as limited on a seasonal

basis and placed "approximately 190,349 acres of public land in an 'open' OHV category."

48.    In 2003, the Price Field Office finalized the San Rafael Route Designation Plan

(SRRDP), the route-level implementation of the 1991 San Rafael RMP. *See Williams v.*

*Bankert*, 2007 WL 3053293 (D. Utah Oct. 18, 2007). The 2003 SRRDP designated routes

solely in the areas "limited to designated roads and trails" in the 1991 San Rafael RMP. BLM

designated certain routes for motorized vehicle use it determined served as important access

for recreation (routes to viewpoints/points of interest, routes to trailheads, scenic loops)

without compromising natural resources, as well as routes that could be reasonably patrolled

and maintained. BLM declined to designate routes it determined were duplicate routes, caused

conflicts between motorized and non-motorized users, or that resulted in resource damage or

route proliferation. The 2003 SRRDP designated a total of 670 miles of OHV routes, including

132 miles of routes within the lands that now make up the San Rafael Desert TMA.

49.     In 2008, the Price Field Office issued the Price Resource Management Plan ("Price RMP"). The Price RMP revised and unified two prior land use plans: the 1991 San Rafael RMP and the 1983 Price River Resource Area Management Framework Plan. The Price RMP adopted the 2003 SRRDP in its entirety, and in addition designated 606 miles of routes across the field office and within the areas not previously encompassed in the 2003 SRRDP.

50.      The Price RMP ultimately designated a total of 1,276 miles of motorized routes available for public use across the Price Field Office. *Id.* at 26. Of those 1,276 miles of motorized routes, 308 miles are within the San Rafael Desert TMA. In other words, following BLM's release of the 2008 Price RMP, OHV use was only permitted on 308 miles of dirt roads and trails in the TMA.

**IV.     A New San Rafael Desert-Specific Travel Management Plan**

51.     In 2015, BLM initiated a scoping period for a new San Rafael Desert-specific travel management plan. Appellants submitted scoping comments highlighting a number of issues for BLM to consider and specifically requested that BLM avoid designating routes that are revegetating, reclaiming, or do not exist on the ground. SUWA also provided a number of route-specific comments, provided context regarding prior travel planning efforts and proposed a designated route system.

52.     In 2017, BLM's San Rafael Desert travel planning process became subject to a settlement agreement stemming from a federal court lawsuit filed by a coalition of conservation organizations, challenging the legality of the Price RMP and RMPs from five other Utah field offices. The court held that several aspects of the Richfield Field Office RMP and travel management plan violated environmental and cultural preservation laws. *See*

17

*generally S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1104-06 (D. Utah 2013)

(collecting cases), *vacated sub nom. S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No.

2:12-cv-257-DAK, 2017 WL 11516766 (D. Utah May 17, 2017).

53.     In the wake of the Richfield RMP decision, the conservation groups, BLM and

three OHV groups signed a settlement agreement that established a schedule and process for

BLM to complete thirteen new travel plans across eastern and southern Utah. Settlement

Agreement, *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257 (D. Utah

Jan. 13, 2017) (Docket No. 513) ("Settlement Agreement"). The San Rafael Desert TMP is the

first plan to be completed under the Settlement Agreement.

54.     As part of the Settlement Agreement, BLM was required to complete a Baseline

Monitoring Report for each forthcoming travel plan to better understand the impacts of

motorized vehicles in certain specific regions within those planning areas. Settlement

Agreement ¶ 20.a. BLM's Baseline Monitoring Report for the San Rafael Desert documented

visually-apparent damage to resources caused by motorized vehicles on routes or portions of

routes "that are within or constitute a boundary to a [Wilderness Study Area], Natural Area

and/or lands with BLM-inventoried wilderness characteristics." To complete the report, BLM

was required to visit each of those routes or portions of routes. In addition to damage from

motorized vehicles, the Baseline Monitoring Report documented whether routes were apparent

on the ground and with what intensity routes were being used.

55.     BLM was also required to prepare individual route evaluation forms for each

route considered for designation in the TMP. Settlement Agreement ¶¶ 16.c, 17. The route

evaluation forms were to document *existing* motorized and non-motorized use of routes, the

observed purpose of the route including for recreation, hunting and access to state and private lands, as well as consideration and documentation of known or asserted resource or user conflicts. *See id.* The route evaluation forms were also to document BLM's consideration of the criteria for route designations found at 43 C.F.R. § 8342.1. *Id.*

56.     On June 25, 2019, BLM posted to its "E-Planning" webpage[5] a series of documents related to the San Rafael Desert TMP, including draft alternative maps, BLM's Baseline Monitoring Report, a scoping report and draft route evaluation forms. On August 2, 2019, SUWA provided extensive comments on these documents. SUWA's comments included route-specific comments, proposed alternative route designation schemes, Geographic Information System ("GIS") data and photo points documenting the condition of many of the motorized vehicle routes at issue.

57.     BLM released its draft EA on December 13, 2019. SUWA submitted detailed comments on the draft EA and highlighted legal deficiencies with BLM's NEPA analysis, application of the minimization criteria, 43 C.F.R. § 8342.1, and compliance with the National Historic Preservation Act. Once again, SUWA provided extensive GIS data and photographic documentation supporting its comments on the draft EA. TWS submitted separate comments, as well as the joint comments with the Alliance.

58.     On August 21, 2020, BLM released its Final EA, DR and FONSI, as well as updated route evaluation forms. The EA evaluated what it described as a No Action

---

[5] "E-Planning" is BLM's shorthand for its National NEPA Register webpage.  *See* https://eplanning.blm.gov/eplanning-ui/home.

Alternative (Alternative A) and three action alternatives which would designate varying numbers and miles of routes as open to motorized vehicles.

59.     While there were only 308.6 miles of routes designated as open to motorized vehicles (and 40.9 miles designated as closed) within the San Rafael Desert TMA, *see supra* at ¶ 50, BLM evaluated the various alternatives against a supposed baseline of 1,180.8 miles of inventoried or "evaluated" routes. BLM explained that these additional 872 miles of routes were identified in a rolling 2011-2015 inventory conducted by BLM and its contractors that did not always involve on-the-ground inspection. BLM refers to these additional 872 miles of routes as "other evaluated routes" and states that they both exist on the ground and "have seen continued OHV use since the BLM adopted the 2008 [Price] RMP." BLM further assumes that use on all 1,180.8 miles of evaluated routes "would be expected to see continued use if [the No Action Alternative] were adopted."

60.     Despite BLM's assumption that all 1,180.8 miles of evaluated routes both exist and are used by OHVs, in fact many of those routes are reclaimed, reclaiming or non-existent on the ground. To the extent that OHV users were traveling on those "other evaluated routes," that travel was illegal and a direct result of BLM's failure to implement and enforce the travel plan the agency established through the 2003 SRRDP and Price RMP.

61.     Every alternative BLM considered—including the erroneously labeled "no action alternative"—would allow OHV use on more miles of routes than were designated in the Price RMP: Alternative A: 1,180.8 miles of routes, Alternative B: about 350 miles of routes, Alternative C: about 755 miles of routes and Alternative D: about 868 miles of routes. Moreover, because BLM treated all 1,180.8 miles of "evaluated" routes as "open"—existing

on the ground and receiving motor vehicle use, whether legal or illegal—the EA wrongly stated that none of the action alternatives would result in new surface disturbance in the planning area.

62.    BLM presented its direct, indirect and cumulative environmental effects analysis in comparative form, noting repeatedly that Alternatives B, C and D would each have less environmental impact than Alternative A. BLM based this conclusion on its erroneous assumption that OHV use would "continue" on all 1,180.8 miles of routes if the agency adopted the "no action alternative," much of it illegally.

63.    BLM declined to analyze impacts to air quality, greenhouse gas emissions and climate change.

64.    The EA included only a perfunctory, qualitative discussion of the TMP's potential cumulative impacts. The EA provided an incomplete list of some past, present and reasonably foreseeable actions and concluded that there would be no cumulative effects from OHV travel under any action alternative. The EA did not provide any quantitative analysis of potential cumulative effects.

65.    In its Decision Record, BLM chose a modified Alternative D that designated 766.8 miles of motorized vehicle routes—more than double the number of miles designated in the Price RMP. The Decision Record allows motorized travel and routine maintenance[6] of

---

[6] In addition to authorizing use on the route itself, BLM's decision allows what it describes as routine maintenance extending to the edge of the previous surface disturbance. According to BLM, routine maintenance may include grading and shaping routes, repairs, realignment and placement of gravel surfacing among other activities.

every designated route. BLM explained that its decision "emphasizes maximum mileage available for OHV recreation."

66.     The San Rafael Desert TMP allows OHVs to park and stage for an undefined distance beyond the edge of disturbance of any designated route, regardless of whether vehicles have traveled there before. The Decision Record also "makes clear that roadside camping in the TMA will be allowed within approximately 100 feet of the centerline of designated routes that are open to the public where there is evidence the site has been used in the past, unless otherwise indicated." Neither the Final EA nor the DR identify the location of any such "existing" roadside campsites, though these documents make clear that some unknown number of these sites exist in the planning area.

## V.     Consultation and Conferral under the ESA

### A.  Biological Assessment

67.     In February 2020, BLM issued a biological assessment and request to initiate formal consultation with the Service. The biological assessment purports to describe the actions associated with the San Rafael Desert TMP and potential impacts to threatened and endangered species and their habitats. Like the EA, BLM's biological assessment assumes that all 1,180.8 miles of evaluated OHV routes both exist on the ground and are receiving use. It also assumes that there would be no new routes in the San Rafael Desert TMP and that implementation of the TMP would reduce OHV user inclination to travel off route.

68.     BLM did not conduct surveys to determine the presence or location of any of the federally threatened and endangered listed bird or plant species before completing the biological assessment.

69.     Though it only had minimal previously-obtained information regarding the presence or absence of threatened or endangered plant and animal species within the San Rafael Desert TMA, BLM acknowledged that approval and implementation of the TMP may affect and is likely to adversely affect the following plant species: the threatened Navajo sedge, the threatened Ute ladies'-tresses, the endangered Wright fishhook cactus, the endangered San Rafael Cactus and the endangered Barneby reed-mustard. The biological assessment also concluded that the TMP may affect and is likely to adversely affect the threatened Mexican spotted owl and the threatened Yellow-billed cuckoo.

### B.  The Service's Biological Opinion

70.     In response to BLM's initiation of section 7 consultation, the Service issued a biological opinion in May 2020.

71.      The biological opinion was based on the information provided by BLM in the biological assessment. The biological opinion assumes that there are 1,181 miles of routes existing within the TMA which include 833.5 miles of unofficial (i.e. undesignated) routes. It also assumes that no additional routes would be constructed pursuant to the TMP.

72.     The biological opinion analyzes the effects of the existence and *continued OHV use* of the proposed travel route network on ESA-listed species.  The biological opinion also assumes that all of the routes evaluated as part of the travel planning exist on the ground.

73.     The biological opinion acknowledges that "[n]either habitat evaluations nor protocol surveys have occurred across most of the potential habitat for the [yellow-billed cuckoo] within the TMA."

74.     The biological opinion also acknowledges that there have not been sufficient surveys in the San Rafael Desert project area for Jones cycladenia, Navajo sedge, Ute ladies'-tresses, Wright fishhook cactus, San Rafael Cactus or Barneby reed-mustard.

75.     Despite the lack of information regarding the presence or location of species within the San Rafael Desert area, the Service concluded that the San Rafael Desert TMP is not likely to jeopardize the Mexican spotted owl or the Western yellow-billed cuckoo. The agency based its conclusion on "applicant committed conservation measures" from the 2003 SRRDP and the Price RMP as well as additional TMP-specific conservation measures. Those conservation measures include completing habitat evaluations within the next four years and monitoring routes to ensure compliance with the TMP. The Service also based its conclusion on BLM's claim that the TMP would "be closing a subset of the existing [illegal] routes . . . and will thus reduce impacts in some regions of the TMA."

76.     The Service also concluded that the San Rafael Desert TMP "is not likely to jeopardize the continued existence" of Jones cycladenia, Navajo sedge, Ute ladies'-tresses, Wright fishhook cactus or Barneby reed-mustard. The agency based its conclusion on several unenforceable criteria, including BLM-committed conservation measures, BLM's commitment to monitor routes within occupied habitat to ensure compliance with the TMP, BLM's contention that the San Rafael Desert "does not contain known populations" of the listed plants and BLM's contention that all the routes in the TMP already exist in the landscape.

### FIRST CAUSE OF ACTION
*Violation of FLPMA: Failure to Comply with Minimization Regulations*

77.     SUWA incorporates herein all preceding paragraphs.

78.     FLPMA's implementing regulations and executive orders require BLM to locate OHV trails to "minimize damage to soil, watershed, vegetation, air or other resources of the public lands," to "minimize harassment of wildlife or significant disruption of wildlife habitats," and to "minimize conflicts" with other recreational uses. *See* 43 C.F.R. § 8342.1.

79.     BLM must apply the "minimization criteria" on both a route-by-route basis as well as a travel-network-wide basis. BLM must do more than simply enumerate the minimization criteria when designating routes. Rather, it must apply the criteria and provide a reasonable articulation of the basis for the conclusion that such designations "minimize" impacts to important resources.

80.     BLM adopted the San Rafael Desert TMP without applying the minimization criteria. BLM failed to determine whether the route designations minimize damage to soil, vegetation, wildlife, wildlife habitat, cultural resources, wilderness suitability or threatened and endangered species. And BLM did not demonstrate how its consideration of the minimization criteria led to the selection of routes with the objective of minimizing impacts. Instead, BLM based its decision on "emphasiz[ing] maximum mileage available for OHV recreation."

81.     BLM's failure to minimize impacts to cultural resources, riparian areas, wildlife habitat, wilderness character and other public resources violates FLPMA and its OHV regulations and is arbitrary, capricious, or otherwise not in accordance with law in violation of the APA. 5 U.S.C. § 706.

### SECOND CAUSE OF ACTION
*Violation of the ESA: Biological Opinion Relied on Inaccurate and Incomplete Information*

82.     SUWA incorporates herein all the preceding paragraphs.

83.     The ESA requires BLM to initiate formal consultation before undertaking any action that "may affect" threatened or endangered species or result in destruction or adverse modification of designated critical habitat. 50 C.F.R. § 402.14(a).

84.     To facilitate this process, BLM must prepare a biological assessment to evaluate the potential effects of its actions on listed and proposed species and designated critical habitat to determine whether any such species may be adversely affected by BLM's action. 50 C.F.R. § 402.12(a). BLM must submit this biological assessment to the Service for review. *Id.* § 402.12(j).

85.     In its biological opinion determining whether a proposed action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat, the Service must independently analyze the "effects of the action." 50 C.F.R. § 402.02

86.     The biological opinion must also consider the environmental baseline—the condition of listed species in the action area. 50 C.F.R. § 402.02.

87.     The Service's biological opinion on the San Rafael Desert TMP's impacts on listed plant and bird species failed to fully analyze the direct, indirect and cumulative effects of BLM's approval of the travel plan, including to the Mexican spotted owl, Western yellow-billed cuckoo, Jones cycladenia, Navajo sedge, Utes ladies'-tresses, Wright fishhook cactus, San Rafael Cactus and Barneby reed mustard.

88.     The biological opinion does not include sufficient information regarding the presence or location of the listed plant and animal species within the action area.

89.    The biological opinion inaccurately assumes that each of the OHV routes BLM evaluated exists on the ground and is receiving use from OHVs.

90.    The Service's reliance on inaccurate assumptions and incomplete information renders the biological opinion arbitrary, capricious and not in accordance with the ESA and its implementing regulations, in violation of the APA, 5 U.S.C. § 706(2)(A).

**THIRD CAUSE OF ACTION**
*Violation of NEPA: Failure to Analyze and Disclose Direct and Indirect Impacts of San Rafael Desert TMP*

91.    SUWA incorporates herein all the preceding paragraphs.

92.    NEPA requires BLM to take a "hard look" at the direct, indirect and cumulative effects of its actions. 40 C.F.R. §§ 1508.8; 1508.7.

93.    NEPA requires also requires that BLM discuss alternatives to the proposed action. 42 U.S.C. § 4332(E); 40 C.F.R. § 1508.9(b).

94.    A fundamental component of understanding the environmental effects of a proposed action and evaluating alternatives is recognizing and accurately describing the environmental conditions before a project begins. Without establishing those conditions, there is no way to evaluate the effect a proposed action will have on the environment or permit a reasoned choice among alternatives.

95.    BLM based its entire environmental impact analysis on the incorrect assumption that all of the 1,180 miles of OHV routes the agency evaluated in the San Rafael Desert TMP both exist on the ground and are receiving continued OHV use.

96.    Accordingly, BLM's "hard look" analysis is based on the erroneous assumption that any of the alternatives in the San Rafael Desert TMP would not cause any new surface

disturbance. BLM relied on this assumption despite the agency's own contradictory information which confirmed that many of the evaluated routes are reclaimed, reclaiming or do not exist on the ground.

97.     BLM's improper and unsupported assumption regarding the current miles of OHV trails and use underlies its entire environmental impact analysis and skewed the agency's NEPA analysis. As a result, BLM ignored the significant effects of introducing OHV use and surface-disturbing maintenance on reclaimed, reclaiming and non-existent routes.

98.     BLM's reliance on a demonstrably inaccurate assumption undermines its effects analysis, violates NEPA and its implementing regulations and is arbitrary, capricious and contrary to law in violation of the APA. 5 U.S.C. § 706.

**FOURTH CAUSE OF ACTION**
*Violation of NEPA: Failure to Take a Hard Look at Impacts from Parking, Staging and Dispersed Camping*

99.     SUWA incorporates by reference all preceding paragraphs.

100.    NEPA requires BLM to take a "hard look" at the direct effects of its actions— those that are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

101.    BLM failed to take into account the actual physical area that will be made available to OHV use. The Price RMP and San Rafael Desert TMP allow vehicles to travel off of designated routes to park, stage and pass other vehicles. The San Rafael Desert TMP also allows roadside camping within approximately 100 feet of the centerline of designated routes where there is evidence that the site has been used in the past. BLM made no effort to identify

the location of any such instances of roadside camping in the TMA, though it acknowledges these spur routes exist.

102.    Despite this, BLM made no attempt to analyze the direct impacts to this larger area beyond the designated routes themselves.

103.    BLM's failure to analyze these impacts violates NEPA's hard look mandate and is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2).

**FIFTH CAUSE OF ACTION**
*Violation of NEPA: Failure to Analyze and Disclose Cumulative Impacts*

104.    SUWA incorporates by reference herein all preceding paragraphs.

105.    NEPA requires BLM to take a "hard look" at all cumulative impacts of the San Rafael Desert TMP. *See* 40 C.F.R. § 1508.7. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions . . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*

106.    To analyze cumulative impacts, BLM must catalogue past, present and reasonably foreseeable uses and management actions in the area that might impact the environment and then analyze these impacts in light of the proposed action. That analysis must include some quantified or detailed information.

107.    The San Rafael Desert TMP EA did not analyze and disclose the cumulative impacts of its decision when viewed with past, present and reasonably foreseeable management actions both within and adjacent to the TMA. Nor did BLM include any quantified or detailed information on potential cumulative impacts.

108.    BLM's failure to analyze the cumulative impacts of the San Rafael Desert TMP violates NEPA's hard look mandate and is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and against Defendants and provide the following relief:

(1) Declare that Defendants have violated FLPMA, the ESA, NEPA and their implementing regulations;

(2) Declare unlawful and set aside the San Rafael Desert TMP and biological opinion;

(3) Enjoin Defendants from taking any actions pursuant to the San Rafael Desert TMP until they have complied with FLPMA, the ESA, NEPA and their implementing regulations;

(4) Retain continuing jurisdiction of this matter until Defendants fully remedy the violations of law complained of herein;

(5) Award Plaintiffs the costs they have incurred in pursuing this action, including attorneys' fees and costs, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable statutes; and

(6) Grant such other relief as is proper.


DATED: February 16, 2021

Respectfully submitted,

/s/ Laura Peterson

_____

Laura E. Peterson
Stephen H.M. Bloch
Joseph J. Bushyhead
*Attorneys for Plaintiffs Southern Utah Wilderness*
*Alliance and The Wilderness Society*